**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1330

FELIPE PEREZ PEREZ,

        Plaintiff – Appellant,

    v.

LEE FRANCIS CISSNA, Director, United States Citizenship and Immigration Services,

        Defendant – Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:16-cv-00748-RJC-DSC)

Argued: October 30, 2018                               Decided: January 29, 2019

Before WILKINSON, KING, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion. Judge Quattlebaum wrote the majority opinion, in which Judge Wilkinson joined. Judge King wrote a dissenting opinion.

**ARGUED:** Bradley Bruce Banias, BARNWELL WHALEY PATTERSON AND HELMS, Charleston, South Carolina, for Appellant. Sheetul S. Wall, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Chad A. Readler, Acting Assistant Attorney General, William C. Peachey, Director, Brian Ward, Senior Litigation Counsel, District Court Section, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

QUATTLEBAUM, Circuit Judge:

This case involves the application of 8 U.S.C. § 1101(a)(27)(J), a means for immigrant children to become lawful permanent residents of the United States if they meet the statutory special immigrant juvenile ("SIJ") requirements. One of the requirements is a qualifying state court custody order. Today, we address the narrow question of whether the temporary, *ex parte* emergency order presented by Felipe Perez Perez qualifies as a predicate state court custody order for the SIJ application. The United States Citizenship and Immigration Services (the "Agency"), the Administrative Appeals Office ("AAO") and the district court concluded it did not. For the reasons set out below, we affirm.

I.

A.

Before examining the facts of this case, we briefly summarize the SIJ statute. Under 101(a)(27)(J) (8 U.S.C. § 1101 (a)(27)(J)) of the Immigration and Nationality Act, an SIJ is "an immigrant who is present in the United States":

> (i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;
>
> (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

2

(iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status[.][1]

8 U.S.C. § 1101(a)(27)(J). To become an SIJ, an immigrant child must apply for that status with the Agency. He or she bears the burden of proving the SIJ requirements. *Id.* § 1361. If an applicant obtains SIJ status, he or she is potentially eligible for lawful permanent resident status. If an SIJ is granted lawful permanent resident status, he or she may eventually apply for United States citizenship.

B.

This case involves Perez's application for SIJ status. Perez was born on July 6, 1997 in Guatemala. At age 16, he unlawfully entered the United States around January 14, 2014. Upon entry, the U.S. government apprehended Perez and placed him into custody. The government initiated removal proceedings against Perez. Shortly thereafter, the government transferred him to North Carolina, where his brother lived, and released him to his brother.

A year later, around January 20, 2015, Perez's brother filed a complaint in state court seeking custody of Perez by alleging that Perez, then 17, was abandoned, neglected

---

[1] In 2008, Congress passed the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110–457, 122 Stat. 5044 (2008) which made significant amendments to the SIJ statute. Congress appropriately named the Act in honor of William Wilberforce, an influential English politician and social reformer. Although his story is unknown to far too many in the United States, Wilberforce's positive contributions are hard to overstate. Wilberforce's most well-known contribution was leading the effort to end slavery in England. Notable American figures like Abraham Lincoln and Frederick Douglass admired Wilberforce and referred to him as the pioneer of the abolitionist movement.

and abused by his parents in Guatemala. Perez's brother later filed a Motion for Temporary Emergency Custody. A North Carolina juvenile court issued an order on June 29, 2015, granting *ex parte* "emergency temporary custody" of Perez to his brother and scheduling a hearing to determine custody for July 22, 2015, just a few weeks later, for which notice to Perez's parents was required. In the order, the juvenile court found that pursuant to N.C. Gen. Stat. §§ 50A-204(a) and 50A-311, it had temporary emergency jurisdiction to protect the child based on the information it had been presented at that time. The court further found that "[r]eunification with the biological parents is not viable due to abuse, neglect, abandonment, or a similar basis found under state law," and, *inter alia*, that it was in Perez's "best interest for temporary and permanent custody to be awarded to the Plaintiff." J.A. 129.[2] After granting Perez's brother temporary emergency custody and control of the minor child, the juvenile court expressly acknowledged that the "terms of this Order shall remain in effect until the Court date noted below," i.e., July 22, 2015. J.A. 129.

Perez turned 18 on July 6, 2015, just a few days after the emergency order and about two weeks before the scheduled July 22, 2015 hearing. This divested the juvenile court of jurisdiction over Perez. Therefore, the July 22, 2015 hearing never took place.

On his 18th birthday, Perez filed a petition for SIJ status. Perez used the *ex parte* emergency temporary order as the predicate order for his SIJ application to claim, as required by Section 1101(a)(27)(J)(i) and (ii), that a court had (i) placed Perez under the

---

[2] Citations herein to "J.A.___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

4

custody of his brother and determined that reunifying Perez with his parents was not viable due to abuse, neglect, abandonment, or a similar basis under state law; and (ii) determined that it would not be in Perez's best interest to be returned to his previous country of nationality. On or around July 31, 2015, the Agency issued its Notice of Intent to Deny the SIJ petition.

On August 28, 2015, the North Carolina juvenile court issued another *ex parte* order, this one for judgment *nunc pro tunc*. That order made the following findings of fact: (1) an action for *ex parte* temporary emergency child custody was instituted by Perez's brother; (2) an order granting *ex parte* temporary emergency child custody was granted on June 29, 2015; and (3) "[b]ecause the child turned 18 years old four days after the signing of the Order, the Order granting temporary custody to Plaintiff was as permanent as possible under North Carolina [l]aw." J.A. 88.

On September 23, 2015, the Agency denied Perez's application for SIJ status. The Agency determined that the juvenile court order submitted in support of the petition was "expressly temporary in nature and therefore does not make the finding that reunification with one or both parents is permanently not viable." J.A. 73. After Perez appealed, the AAO reviewed the Agency's decision de novo and dismissed the appeal in a decision dated May 9, 2016.

## C.

On October 28, 2016, Perez filed a complaint in the United States District Court for the Western District of North Carolina against the Director of the Agency, seeking declaratory relief and review of the AAO's decision under the Administrative Procedure

Act ("APA"). Perez subsequently filed a motion to set aside final agency action. Perez claimed the Agency and the AAO imposed an *ultra vires* requirement that the predicate custody order required by the SIJ application process be permanent. Alternatively, Perez argued the Agency and AAO acted arbitrarily or capriciously in differentiating between temporary emergency custody orders and permanent custody orders. The Agency moved for judgment on the record affirming the denial of the SIJ application.

The district court rejected Perez's claims. In concluding that the temporary emergency custody order did not suffice to establish the requisite findings for SIJ status, the district court found that the Agency and AAO did not act arbitrarily and capriciously. Instead, the district court held they simply gave the temporary emergency custody order the same effect it would have been given in North Carolina. The district court thus denied Perez's motion to set aside final agency action and granted the Agency's motion for judgment on the record in an order signed March 6, 2018.

Perez filed a timely appeal, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review both the district court's grant of judgment on the administrative record and denial of Perez's motion to set aside the Agency's action de novo. *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014); *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392–93 (4th Cir. 2014). That requires us to apply the same legal standards the district court applied in addressing Perez's motion to set aside the Agency's decision and the Agency's motion for judgment on the record. *Lawson v.*

*Union Cty. Clerk of Court*, 828 F.3d 239, 247 (4th Cir. 2016).  The district court properly analyzed the Agency and AAO decisions based on the scope of review permitted under the APA. 5 U.S.C. § 706(2)(A).

Under the APA's deferential standard, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In determining whether to set aside an agency's action as arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law, a reviewing court must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action. . . ." *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.,* 677 F.3d 596, 601 (4th Cir. 2012) (alteration in original) (internal quotation marks omitted) (quoting *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009)).

Although this Court will "accord substantial deference to an agency's final action and presume it valid, 'the arbitrary-and-capricious standard does not reduce judicial review to a rubber stamp of agency action.'" *Ergon-W. Va., Inc. v. U.S. Envtl. Prot. Agency*, 896 F.3d 600, 609 (4th Cir. 2018) (quoting *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012)).  This Court must conduct a "searching and careful review to determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 270 (4th Cir. 2018) (internal quotation marks omitted) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S.  360, 378 (1989)).

But the review under the APA is narrow and highly deferential. *Webster v. U.S. Dep't of Agric.,* 685 F.3d 411, 422 (4th Cir. 2012). If the agency has followed proper procedures and has presented a rational basis for its decision, we will not disturb the agency's judgment. *Id.*

With these standards in mind, we turn to Perez's arguments on appeal.

III.

Perez makes three primary challenges on appeal: (1) the Agency imposed an *ultra vires* permanency requirement with regard to the state custody order beyond the statutory and legislative intent; (2) the Agency's decision should be set aside as arbitrary and capricious because, even if a permanency requirement is authorized, Perez's custody order was permanent enough to satisfy the Agency's policy manual; and (3) the Agency failed to give full faith and credit to a facially legitimate state custody order and *nunc pro tunc* order.

A.

As an initial matter, Perez contends that the Agency imposed a "permanency" requirement that is *ultra vires* and unlawful. Perez argues that neither the text, structure or history of the SIJ statute requires a qualifying custody order to be permanent. Perez argues the statute does not include temporal language pertaining to the required order, and argues that the Agency, in requiring an order to be permanent, has gone beyond its delegated authority.

This Court's review under the *ultra vires* standard is "necessarily narrow." *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.,* 698 F.3d 171, 179 (4th Cir.

8

2012).  This Court does not stand to "dictate how government goes about its business." *Id.*  Instead, this Court's role is only to determine whether an agency has acted within the bounds of its authority or overstepped them. *Id.*  Government action is *ultra vires* if the agency or other government entity "is not doing the business which the sovereign has empowered [it] to do or [it] is doing it in a way which the sovereign has forbidden." *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689 (1949).  Neither situation is present here.

First, Perez mischaracterizes the decisions of the Agency and the AAO in arguing that they impose a permanency requirement. The decisions merely evaluate whether the particular order presented by Perez qualified under the SIJ statute.[3]

To be sure, the Agency and AAO refer to the temporal aspects of the order as part of their decisions. However, neither imposed a categorical permanency requirement to the predicate state court order required by the statute. Likewise, when read in totality, neither decision implied that permanency is essential. In fact, in the analysis portion of its order, the AAO does not use the word permanent other than in its reference to the language of the *nunc pro tunc* order itself and Perez's own assertions on brief.

Further, the references to the temporal aspects of the order are only part of the Agency and AAO's decisions. The decisions focus more on the terms of the order that reflect its *ex parte* and emergency nature. To review those terms, the juvenile court

---

[3]  The dissent joins with Perez on this issue and we part ways on this foundational point.

9

invoked temporary emergency jurisdiction based on N.C. Gen. Stat. § 50A-204(a) and § 50A-311.[4] Under North Carolina law, particularly as applied in this context, "[w]hen a court invokes emergency jurisdiction, any orders entered shall be temporary protective orders only." *In re Brode*, 151 N.C. App. 690, 693, 566 S.E.2d 858, 860 (N.C. Ct. App. 2002) (referencing proceedings in abuse, dependency, and/or neglect cases, and addressing the nature of North Carolina court's ability to exercise jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act). The June 29, 2015 order granted Perez's brother "emergency temporary custody and control of the minor child," ordered notice of the hearing be provided to Perez's parents and specified that the terms of the order remained in effect for less than 30 days. J.A. 129–130. The order was plainly an emergency order based on the limited and *ex parte* information provided to the court. The order was intended to maintain the status quo until the issues could be addressed in a more substantive manner.[5] Here, the Agency evaluated the order

---

[4] Under N.C. Gen. Stat. § 50A-204(a), "[a] court of this State has temporary emergency jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." N.C. Gen. Stat. § 50A-204(a). N.C. Gen. Stat. § 50A-311 provides a remedy for emergency situations where there is reason to believe that a child will suffer imminent, serious physical harm or be removed once the respondent learns that the petitioner has filed an enforcement proceeding. When asked during oral argument, however, Perez was unable to identify the nature of the emergency in this case.

[5] Further, the August 28, 2015 *nunc pro tunc* order does not lead to any different result. The June 29, 2015 order could not be revived by the *nunc pro tunc* order issued after Perez turned 18, the age upon which he was no longer considered a child under North Carolina law. *See* N.C. Gen. Stat. § 50A-102(2) (defining "child" as someone (Continued)

10

presented by Perez, and found its *ex parte*, emergency nature did not meet the SIJ requirements under the statute.

Aside from its emergency nature and terms which were only intended to remain in effect for about three weeks, the order was issued without notice to Perez's parents.[6] The emergency order was based on information provided only by Perez's brother without an opportunity for those allegations to be challenged or contested. In other words, Perez's parents were not given notice so that they, if they elected to do so, could contest the allegations in the complaint and oppose an outcome that altered their parental rights. Although we do not doubt the appropriateness of such an order under North Carolina law

---

"who has not attained 18 years of age" for purposes of the Uniform Child-Custody Jurisdiction and Enforcement Act).

[6] Perez claims that under 8 U.S.C. § 1357(h), he should not be required to communicate with an alleged abuser at any stage of applying for SIJ status. Section 1357(h) provides that an alien seeking SIJ status who has been "battered, abused, neglected, or abandoned, shall not be compelled to contact the alleged abuser…at any stage of applying for special immigrant juvenile status…." 8 U.S.C. § 1357(h). By its express terms, however, 8 U.S.C. § 1357(h) is in reference to the SIJ application process and applies once a qualifying order is in place.

North Carolina imposes its own requirements regarding custody determinations, separate and apart from an applicant's petition for SIJ status. Under North Carolina law, before exercising jurisdiction "regarding the parental rights of a nonresident parent, the court shall find that it has jurisdiction to make a child-custody determination under the provisions of G.S. 50A-201 or G.S. 50A-203, without regard to [temporary emergency jurisdiction under] G.S. 50A-204 and that process was served on the nonresident parent . . . ." N.C. Gen. Stat. § 7B-1101; *see also In re N.T.U.*, 234 N.C. App. 722, 725, 760 S.E.2d 49, 53 (N.C. Ct. App. 2014) (noting a court "must have jurisdiction to make a child-custody determination under the provisions of N.C. Gen. Stat. § 50A–201 or N.C. Gen. Stat. § 50A–203 in order to terminate the parental rights of a nonresident parent.").

11

in the event of an emergency, the Agency and the AAO had the right to consider whether the nature and terms of such an order met the SIJ qualifications under the Act. In carrying out this responsibility, the Agency found that the order, because of its particular terms, did not satisfy the Act's requirements.

Determining whether an order meets the statutory requirements does not exceed or conflict with the Agency's authority. To the contrary, such a determination is exactly what the Agency has been tasked to do. *See* 8 C.F.R. § 204.11(d); *Budhathoki v. Nielsen*, 898 F.3d 504, 511 (5th Cir. 2018) ("This sort of agency obligation to review state court orders for their sufficiency is certainly the approach of the regulations identifying the documents that must be submitted in support of SIJ status. . . .").

We find the Fifth Circuit's decision in *Budhathoki v. Nielsen* to be persuasive in this regard. In a similar appeal challenging the Agency's denial of an application for SIJ status, the Fifth Circuit noted that the question was "whether the right kind of court issued the right kind of order." *Id.* at 509. Although a state court makes the initial determinations, the Agency considers whether those orders match the requirements for SIJ status consistent with federal requirements. *Id.* Ultimately, the Agency determines if the petitioner meets the requirements for SIJ classification, and the burden is on the petitioner to establish eligibility. *See* 8 U.S.C. § 1361 (burden of proof upon alien). As described above, that is precisely what the Agency did here.

In making these observations about the order, we are not criticizing the North Carolina court. That court did what it could with the information provided. State courts should follow their own state law as it pertains to making custody determinations. But

12

the Agency also has an obligation to determine whether the orders, documentation and other evidence presented satisfy the SIJ statutory requirements for eligibility of a federal benefit. *See M.B. v. Quarantillo*, 301 F.3d 109, 115 (3d Cir. 2002) (recognizing the Immigration and Naturalization Service can reasonably consider the requirements of a petition for SIJ classification). Indeed, the statutory scheme requires that the Secretary of Homeland Security consent to the grant of the SIJ status to confirm the request for SIJ classification is bona fide and not done solely or primarily to obtain an immigration benefit. 8 U.S.C. § 1101(a)(27)(J)(iii). Here, the Agency, a bureau of the Department of Homeland Security, and AAO made a determination as to whether Perez had presented a qualifying predicate order. Making such a determination was within the bounds of their authority. The Agency did not act in an *ultra vires* way when it determined that the juvenile court order at issue here was not qualifying.

Last, and with all due respect to our good colleague in dissent, neither the decisions below nor this opinion represent an assault on principles of federalism. We join our colleague in support of those principles. Here Perez sought a federal benefit in applying for SIJ status. The federal agency charged with determining whether Perez qualified for that benefit had every right to review the pertinent state court order to see if it qualified. That is all that happened here. Respect for federalism does not require that

13

either the Agency, the AAO or this Court ignore the language of the order—or the way in which the order was obtained—in evaluating whether Perez qualified for SIJ status.[7]

B.

Perez's second point of error is that the Agency's decision should be set aside as arbitrary and capricious because, even if a permanency requirement is authorized, Perez's custody order was permanent enough to satisfy the Agency's manual and was appropriate under North Carolina law. Here again, we disagree with Perez's characterization of the Agency's decision as imposing a "permanent" custody requirement. As fully discussed above, the Agency was simply applying the statute to find that Perez had not presented a qualifying predicate order. The district court properly deferred to the Agency's reasoning, which articulated the Agency's determination about the order's compliance with the SIJ requirements.

The Supreme Court has indicated that the "scope of review under the 'arbitrary and capricious' standard is narrow, and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts

---

[7] Nor does federalism require us to ignore Perez and his brother's apparent attempt to manipulate the ability to obtain emergency *ex parte* relief under North Carolina domestic relations law to gain an immigration advantage. As noted above, Perez's brother alleged temporary emergency custody of Perez was needed to protect Perez from imminent serious physical harm from Perez's parents in Guatemala. At the time the motion containing this allegation was filed, however, Perez had been in the United States, over 2,700 miles from his parents, for over a year. In fact, when asked at oral argument the basis of the purported emergency, counsel for Perez was unable to provide any explanation.

14

found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) (internal citation omitted). Here, the Agency reasonably relied on state law in determining the limited scope of the *ex parte* temporary emergency order and *nunc pro tunc* order, as well as the Agency's regulations and other guidance in making its determination. Moreover, the Agency explained its reasons for doing so. Therefore, the decision was not arbitrary or capricious, or otherwise contrary to law.

Further, the district court did not substitute its views for that of the Agency. We decline to do so as well. The district court here found that the juvenile court's *ex parte* emergency custody order failed to qualify as the necessary juvenile court predicate order. In so doing, the district court recognized the deference afforded to agency decisions, rejected the notion that the Agency added an unauthorized requirement of permanency to the SIJ application process and noted the Agency's decision that proper state-level determinations for SIJ status were not made as defined by North Carolina law. As long as the Agency "provide[s] an explanation of its decision that includes a rational connection between the facts found and the choice made," its decision should be sustained. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,* 556 F.3d 177, 192 (4th Cir. 2009) (internal citations and quotation marks omitted). Although the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given," we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (internal citation and

quotation marks omitted). Just as the district court found, we have no trouble tracing the Agency's decisional logic here.

Perez also argues the June 29, 2015 order qualified under the SIJ statute and satisfied the requirements of the Agency's manual because the North Carolina court intended for the order to remain in effect until Perez reached the age of majority. Perez claims this is significant because the Agency's manual states "USCIS generally requires that the court order be valid at the time of filing and must determine that the court intends that the child will not reunify with at least one parent until the child reaches the age of majority." J.A. 192. Perez argues the evidence of the North Carolina court's intent is the fact that the court scheduled a second hearing for July 22, 2015 —a date which fell after Perez turned 18—with the factual knowledge of when he would turn 18. Based on this, Perez argues the Agency's decision was arbitrary and capricious.

This position, while creative, finds no support in the text of the order. The court did not state that the finding related to reunification was intended to last to the age of majority. It simply set a date a mere three weeks in the future where the court could address the issues with appropriate procedural requirements in place. Rather than indicating intent that might make the order qualify under the SIJ statute or the Agency manual, the language in the order instead indicates the North Carolina court recognized the emergency, *ex parte* order was simply to preserve the status quo.

Further, if the North Carolina court intended for its order to be anything more than an emergency custody order, there would have been no need for that court to issue a second *ex parte* order, which concluded that "due to the child's age at the time the order

16

was entered, the order was as permanent as possible under North Carolina law." J.A. 89. We, therefore, reject Perez's argument.

C.

Finally, Perez argues that this Court should reverse the district court's decision that the Full Faith and Credit Act does not apply to the Agency's decision. Perez maintains that the Agency failed to give full faith and credit to the state court temporary custody order and *nunc pro tunc* order. For this argument, Perez cites to our own precedent of *Ojo v. Lynch* for the proposition the federal government has historically deferred to state-law policy decisions with respect to domestic relations. This proposition is not in dispute. But *Ojo* referenced the Full Faith and Credit Act simply as an example of the federal policy of deference to state-law policy decisions. *Ojo v. Lynch*, 813 F.3d 533, 540 (4th Cir. 2016). In recognizing the state law nature of domestic relations matters, *Ojo* did not hold that the Full Faith and Credit Act applies to agencies.

Turning now to the Full Faith and Credit Act, the Act provides a federal court should, as a general rule, accord prior state adjudications the full force, respect, and effect that they would have under the law of the state in which the judgment was rendered. *Robart Wood & Wire Prod. Corp. v. Namaco Indus., Inc.*, 797 F.2d 176, 178 (4th Cir. 1986); *Jaffe v. Accredited Sur. & Cas. Co.*, 294 F.3d 584, 590 (4th Cir. 2002). But the Act does not apply to agencies. The text of the Act is clear. "Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in *every court* within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they

17

are taken." 28 U.S.C. § 1738 (emphasis added). The Agency is not a court. Thus, the plain language of 28 U.S.C. § 1738 establishes that it does not apply to the Agency. *See also Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 799 (5th Cir. 2000) (holding that the "plain language of this section establishes that it does not apply" to an agency); *N.L.R.B. v. Yellow Freight Sys., Inc.*, 930 F.2d 316, 320 (3d Cir. 1991) (holding "federal administrative agencies are not bound by section 1738 because they are not 'courts.'"); *McInnes v. California*, 943 F.2d 1088, 1095 (9th Cir. 1991) (concluding that a state administrative agency was akin to a federal agency and therefore not a court for purposes of 28 U.S.C. § 1738 as a matter of federal law). Accordingly, we find no error in the district court's decision that the Full Faith and Credit Act was inapplicable.

Last, even if the Full Faith and Credit Act applied to agencies, the Agency here gave the proper effect to the relevant state court decisions. Respecting a state court order does not require the Agency to give the order more import than its terms provide. By the June 29, 2015 order's own terms, it was expressly temporary and did not make more than an emergency custody determination to maintain the status quo until a full hearing could be held. Perez's arguments read more into the *ex parte* emergency order than its terms provide. Accordingly, we find no error in the district court's ruling.

IV.

The district court properly held that the Agency did not impose an *ultra vires* requirement for permanent custody orders within the SIJ application process. We agree that the Agency did not act arbitrarily, capriciously or contrary to law, or abuse its discretion in determining that Perez failed to present a qualifying predicate order in

18

support of his SIJ petition.    Finally, the Full Faith and Credit Act is inapplicable under the facts presented in this case.

Accordingly, the judgment of the district court is

*AFFIRMED*.

KING, Circuit Judge, dissenting:

I write separately to explain my view that the immigration authorities and my good colleagues in the panel majority have erred in their rulings on the SIJ application of Felipe Perez. Their fatal error primarily relates to the failure to adhere to North Carolina state law concerning child custody orders, particularly as to the custody of Felipe. As explained further below, I would reverse the immigration rulings and remand.

The USCIS has erroneously decided that an applicant for SIJ status must produce a "permanent" custody order. The Agency predicates this requirement on a faulty reading of the INA, which governs SIJ eligibility. Felipe challenges that interpretation, which led the Agency to wrongfully deny his SIJ application. My friends in the panel majority, however, have not resolved this straightforward question of statutory construction and have thereby committed two errors. First, the majority mistakenly applies a deferential standard of review to the Agency's flawed interpretation. Second, by avoiding that interpretive issue, the majority tacitly accepts the Agency's requirement that a custody order supporting an SIJ application must be "permanent." That requirement, however, finds no support in the INA. Absent a clear directive from Congress, long-standing principles of federalism compel our deference to state law in the sensitive area of domestic relations, which encompasses such custody determinations. Because the North Carolina district court issued a valid custody order regarding Perez, both the Agency and this Court are obliged to respect it. The Agency erred in denying Perez's SIJ application, and I therefore dissent.

I.

To start, it is necessary to clarify the standard of review that governs Felipe's appeal. The majority opinion correctly explains that a challenge to an agency decision — specifically, the denial of Felipe's SIJ application by the USCIS — is subject to review under the APA. That is, we should only set aside that denial if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). The latter aspect of that APA provision — "otherwise not in accordance with law" — is particularly relevant here. As the Supreme Court explained long ago, "an order may not stand if the agency has misconceived the law." *See SEC v. Chenery*, 318 U.S. 80, 94 (1943). Thus, "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *See PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) (citing *South Prairie Constr. Co. v. Int'l Union of Operating Eng'rs*, 425 U.S. 800, 806 (1976); *Chenery*, 318 U.S. at 94-95)).

Put simply, the decisions of the Agency and its AAO that Felipe challenges readily show such a legal error. The Agency and the AAO did not merely "evaluate whether the particular [custody] order presented by Perez" satisfied the SIJ provision. *See ante* at 9. That is, the proper focus of our review is not whether the Agency correctly assessed the particular facts of Felipe's SIJ application. Rather, the Agency's denial of his SIJ application makes clear that the Agency has adopted a specific interpretation of the SIJ statutory provision, and that it denied his application for SIJ status on the basis of that

21

interpretation. More specifically, the Agency reads the statutory requirement that an SIJ applicant be "under the custody of" an agency or individual in the United States to require a *permanent* custody order. *See* J.A. 27.[1] And the Agency and AAO denied Felipe's application because the North Carolina custody order he submitted with his application apparently lacked such permanence. *See id*. at 22-23, 26-27. The question presented, therefore, is one of statutory interpretation.

This crucial point bears further explanation, since it marks where I diverge from my colleagues. The panel majority opines that the Agency and AAO did not impose "a categorical permanency requirement" on a child's custody order required for SIJ eligibility. *See ante* at 9. It is this mistaken view of the immigration rulings that leads the majority to erroneously apply the deferential arbitrary and capricious standard. *See id*. at 7, 9-10.

The decisions of the Agency and AAO as to Felipe Perez belie that conclusion. In their rulings, the immigration authorities fault the temporary nature of Felipe's custody order and explicitly deny his application on that basis. *See* J.A. 27 (As the Agency emphasized in this case, "the [North Carolina] court order submitted is expressly temporary in nature and does not make a finding that reunification with one or both parents is permanently not viable."); *id*. at 22 (The AAO further explained: "Accordingly, the [North Carolina] *ex parte* emergency order was not a qualifying juvenile court order . . . because there was no finality to the proceedings."). Notably, the

---

[1] Citations herein to "J.A.__" refer to the contents of the Joint Appendix filed by the parties in this appeal.

Government's brief on appeal seeks to sustain the Agency's denial of Felipe's application on that specific ground. *See, e.g.*, Br. of Appellee 20, 24. Although "the AAO does not use the word permanent" in its rejection of Perez's custody order, that point is irrelevant when the Agency has repeatedly faulted the custody order as "temporary" and lacking "finality" — that is, for not being permanent. *See ante* at 9; J.A. 22-23, 26-27.[2]

In sum, the Agency rulings make clear — beyond peradventure — that the Agency interprets the SIJ provision to require a permanent custody order. Moreover, the Agency has openly adopted that interpretation in their policy manual, as discussed below. *See* J.A. 186-87. Accordingly, our review today turns only on whether the Agency's interpretation of the term "custody," as used in the SIJ provision, is correct as a matter of law.

Recognizing that Felipe's appeal challenges the Agency's interpretation of a federal statute, the question becomes whether we owe any deference to that interpretation. Notably, the record offers no evidence that the Agency arrived at its understanding of the SIJ provision through formal rule-making or some other process that would endow its view with the force of law. As a result, the significant deference afforded to decisions that result from such processes under the *Chevron* doctrine does not apply here. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (explaining

---

[2] The Agency explained its rejection of Felipe's SIJ application by referring to his custody order as "expressly temporary" three separate times. *See* J.A. 26-27. And it concluded on that basis that Felipe had not demonstrated his eligibility for SIJ status. *See id*. at 27 ("In this case, the court order submitted is expressly temporary in nature . . ."). The AAO ruling mirrored that analysis. *See id*. at 22-23 (concluding that custody order failed to satisfy SIJ provision because it was merely "temporary protective order[]").

scope of deference under doctrine announced in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)); *see also Ramirez v. Sessions*, 887 F.3d 693, 701 (4th Cir. 2018) (same).  Nor does the Agency's position merit deference under the Supreme Court's decision in *Auer v. Robbins*, which applies only to an agency's interpretation of its regulations.  *See* 519 U.S. 452, 461 (1997).  Again, the Agency has not promulgated any regulations regarding the meaning of the term "custody," as used in the SIJ provision.

Instead, the Agency has presented its interpretation of the SIJ provision in what it calls a "policy manual."  *See* J.A. 186-87; *see also* U.S. Customs & Imm. Serv., *USCIS Policy Manual, Vol. 6: Immigrants* (the "Policy Manual").  Specifically, the Agency's explanation of the SIJ provision in the Policy Manual provides:  "Court-ordered dependency or custodial placements that are intended to be temporary generally do not qualify for the purpose of establishing eligibility for SIJ classification."  *See* Policy Manual, Ch. 2 – Eligibility Requirements, § D.1.

Unfortunately for the USCIS, however, an agency's interpretation of a statute that is "contained in policy statements, agency manuals, and enforcement guidelines" does not receive deference under either the *Chevron* or *Auer* doctrines.  *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *see also Mead*, 533 U.S. at 234-35.  A "policy manual" receives only the deference that is "proportional to its power to persuade," according to the so-called *Skidmore* doctrine.  *See Mead*, 533 U.S. at 234-35 (internal quotation marks omitted) (discussing and applying *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)); *see also Christensen*, 529 U.S. at 587.  Thus, the immigration authorities' position is entitled to deference only to the extent we are persuaded by "the

24

degree of the agency's care, its consistency, formality, and relative expertness," and the overall "persuasiveness of the agency's position." *Mead*, 533 U.S. at 228 (citing *Skidmore*, 323 U.S. at 139-40).[3]

In these circumstances, this appeal cannot be resolved by merely reviewing the Agency's final conclusion under the arbitrary and capricious standard of the APA. Rather, this appeal turns solely on a question of law, and legal issues are reserved to the courts. It therefore falls upon us to assess and decide whether the Agency's interpretation of the term "custody," as used in the SIJ provision, is "otherwise not in accordance with law." With that guiding principle in mind, I will explain why the interpretation of "custody" employed by the Agency and the AAO — that is, limiting the term to permanent custody orders only — cannot be sustained.

## II.

As my distinguished colleagues have ably explained, the INA permits an immigrant juvenile who is present in the United States to seek SIJ status in order to thereafter pursue lawful permanent resident status. *See ante* at 3. To obtain SIJ status, the SIJ applicant must, pursuant to the INA, have either been declared dependent on a juvenile court "or placed under the custody of" an agency or individual in the United

---

[3] To the extent that the Agency and AAO decisions underlying this appeal do not expressly rely on the Policy Manual, those decisions are simply informal adjudications that likewise do not warrant deference under either the *Chevron* or *Auer* doctrines. *See Mead*, 533 U.S. at 230-34; *see also Ramirez*, 887 F.3d at 701. And, as explained above, they emphasize the same permanency requirement adopted in the Policy Manual.

States. *See* 8 U.S.C. § 1101(a)(27)(J). Felipe's appeal centers on the meaning of the phrase "under the custody of," which the Agency has inappropriately rewritten and amended to require a "permanent" custody order. *See* J.A. 27; *see also* Policy Manual, Ch. 2 – Eligibility Requirements, § D.1 (explaining that temporary custody orders "generally do not qualify for the purpose of establishing eligibility for SIJ classification").[4] We are therefore called upon to assess the Agency's interpretation of a statutory term that implicates "traditional state-law questions." *See, e.g.*, *Thompson v. Thompson*, 484 U.S. 174, 186 (1988) (explaining state-law nature of custody determinations).

We recently addressed a similar intersection of federal immigration law with domestic relations law in *Ojo v. Lynch*, 813 F.3d 533 (4th Cir. 2016). As we explained in *Ojo*, if a federal statute incorporates a term that derives from and is controlled by state law principles, those principles — and basic tenets of federalism — inform the plain meaning of the incorporated term. *See id.* at 539-41. According proper weight to federalism principles, I will first evaluate whether the Agency's interpretation of the term

---

[4] The SIJ provision of the INA also requires an SIJ applicant to show that "reunification with 1 or both of the immigrant's parents is not viable." *See* 8 U.S.C. § 1101(a)(27)(J). The Agency likewise invoked this provision to deny Felipe's application, contending that the North Carolina district court failed to make such a finding, and that even if it had, the temporary nature of the order meant that the court could make no finding that reunification was "permanently not viable." *See* J.A. 27. The first Agency contention is simply false, however, because the North Carolina court did make a finding that reunification was not viable. *See id.* at 129. The requirement that such a finding must invoke permanence appears to stem from the Agency's general interpretation that the custody element of an SIJ application requires a permanent order, which is discussed further herein.

"custody" merits deference pursuant to the *Skidmore* doctrine. I will then assess whether the term "custody," as used in the SIJ provision of the INA, renders legally insufficient the custody order that Felipe submitted with his SIJ application.

A.

To start, the markers of "persuasiveness" under the *Skidmore* doctrine do not apply to the agency interpretation at issue here. As explained above, a court considering the extent of deference owed to an agency interpretation under *Skidmore* should consider the "degree of the agency's care, its consistency, formality, and relative expertness," and the overall "persuasiveness of the agency's position." *Mead*, 533 U.S. at 228; *see also Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 288 (4th Cir. 2018) (same). None of those factors urge deference to the Agency's reading of the term "custody."

Put succinctly, the Policy Manual does not evince that it was prepared with a high degree of care, most clearly because its conclusion that "custody" requires "permanence" relies on regulations and unrelated statutory provisions that support no such understanding. *See* Policy Manual, Ch. 2 – Eligibility Requirements, nn. 6-9. For example, in support of its interpretation of "custody" in the SIJ provision, the Manual relies on a statutory provision that discusses *in loco parentis* relationships — which are entirely distinct from custody determinations. *See id*. at n.8.[5]

---

[5] In North Carolina and elsewhere, *in loco parentis* relationships arise in the absence of formal custody determinations, and thus describe a different legal context and status. *See State v. Benitez*, 810 S.E.2d 781, 790-91 (N.C. Ct. App. 2018).

The consistency of the Agency's position is not clear from the present record, although in 2011 it proposed a rule to expressly approve temporary custody orders for SIJ purposes, which was not adopted. *See* 76 Fed. Reg. at 54980. The formality of the Policy Manual appears to be minimal, in that its preparation was not subject to any formal administrative processes. Most importantly, the state law of domestic relations in North Carolina is far beyond the expertise of the Agency. *See, e.g.*, *Thompson*, 484 U.S. at 186 (emphasizing that child custody determinations are "traditional state-law questions"); *see also Mead*, 533 U.S. at 234-35 (explaining that *Skidmore* deference arises from and relates to some "specialized experience" of relevant agency). Finally, as explained below, the position of the Agency fails to persuade in light of the principles of federalism that inform any interpretation of domestic relations law — including "custody" — that arises in federal statutes.

In sum, the Agency's interpretation of the term "custody" — as used in the SIJ provision of the INA — does not merit any deference under *Skidmore*. Thus, my next step is to consider that interpretation de novo, applying ordinary principles of statutory construction. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 645 (4th Cir. 2018) (denying *Skidmore* deference and reviewing de novo agency's statutory interpretation).

B.

Our *Ojo* decision assessed an interpretation of the term "adopted," as used in the INA, that was employed by the Board of Immigration Appeals. *See* 813 F.3d at 535. As here, the question in *Ojo* turned on state domestic relations law, an area in which "the

28

Federal Government, through our history, has deferred to state-law policy decisions." *See id*. at 540 (quoting *United States v. Windsor*, 570 U.S. 744, 767 (2013)); *see also Sosna v. Iowa*, 419 U.S. 393, 404 (1975) (explaining that domestic relations law is "a virtually exclusive province of the States"). There, as here, the INA had incorporated the state law term without modifying, defining, or otherwise limiting it. *See Ojo*, 813 F.3d at 535. Thus, *Ojo* provides the framework for the question presented here.

To discern the plain meaning of the term "custody," we look to the common understanding and ordinary definition of it. *See Ojo*, 813 F.3d at 539-40. In *Ojo*, we also considered the relevant broader context; specifically, we adhered to the federalism principles that have informed the federal government's treatment of domestic relations issues for more than a century. *See id*.; *see also King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (emphasizing that meaning of statutory term "may only become evident when placed in context"); *Ex parte Burrus*, 136 U.S. 586, 593-94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States."). We also followed the Supreme Court's admonition that when an "administrative interpretation" permits "federal encroachment upon a traditional state power," a court must look for a "clear indication" of congressional intent to support that interpretation. *See Ojo*, 813 F.3d at 540 (quoting *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001)).

Applying that approach to the interpretive issue presented in Felipe's appeal, I am satisfied that the term "custody," as used in the INA's SIJ provision, retains its plain and

ordinary meaning. That is, it simply refers to the "care, control, and maintenance of a child awarded by a court to a responsible adult." *See* Custody, *Black's Law Dictionary* (10th ed. 2014). It "involves legal custody (decision-making authority) and physical custody (caregiving authority), and an award of custody [usually] grants both rights." *Id.* That accepted definition of custody admits no temporal limits. Although a person may exercise custodial authority over a child for a period of days or years, the nature of the authority is unchanged.

Indeed — although not in the immigration context — Congress itself has defined a "custody determination" as a court order "providing for the custody of a child," including "permanent and temporary orders." *See* 28 U.S.C. § 1738A. That definition is contained in a statutory provision requiring each state to respect the custody determinations of other states. The Supreme Court subsequently ruled that the provision did not create a federal cause of action due to, inter alia, the long-established primacy of state law in custody determinations. *See Thompson*, 484 U.S. at 186-87. Although not controlling, that provision and the Supreme Court decision interpreting it provide context for the question we are called upon to resolve in these proceedings. Specifically, they emphasize the lack of temporal limits attached to the common understanding of the term "custody," as well as the continued deference we owe to state law and state courts in custody matters.

That context supports the general rule that the plain meaning of a domestic relations term like "custody" — or the term "adopted" at issue in *Ojo* — incorporates an understanding that state courts traditionally exercise full authority over that area of law. *See Ojo*, 813 F.3d at 539 (citing *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2565

30

(2013) (Thomas, J., concurring) (emphasizing that "domestic relations is an area that has long been regarded as a virtually exclusive province of the States") (internal quotation marks omitted)). Thus, absent any contrary indication from Congress, the ordinary meaning of the term "custody" carries the understanding that its specific content is to be determined with due deference to state court rulings. *See id*. at 540.

The SIJ custody provision lacks any indication that Congress "intended to alter or displace" the plain meaning of "custody." *See Ojo*, 813 F.3d at 540. Congress simply did not define "custody" for purposes of the INA, nor did it "circumscribe state authority" over custody in the immigration context, or otherwise confer plenary power in the Agency to "override" traditional state control of child custody issues. *See id*. Absent strong evidence that Congress sought to limit or alter state powers over such matters, the term "custody" retains the understanding that custody determinations are generally conducted "by various state courts pursuant to state law." *See id*.; *see also Windsor*, 570 U.S. at 767 (observing that "there is no federal law of domestic relations") (quoting *De Sylva v. Ballentine*, 351 U.S. 570, 580 (1956)). In such circumstances, a valid custody order from the relevant state court must be given full credit. *See Ojo*, 813 F.3d at 541. Accordingly, the Agency is not entitled to summarily reject such a state court custody order by imposing a permanency requirement lacking any basis in the applicable SIJ provision.

Nor does any other provision or principle of federal law support an amendment to or recasting of the SIJ provision to create a permanency requirement. Notably, the very section of the INA containing the SIJ provision freely uses temporal limitations

31

elsewhere. *See, e.g.*, 8 U.S.C. § 1101(a)(27)(H) (providing that immigrant seeking special status based on medical expertise must have been "permanently licensed" to practice). The omission of such limits from the SIJ provision is therefore highly significant, presumptively intentional, and binding on the Agency and the courts. *See United States v. Serafini*, 826 F.3d 146, 149 (4th Cir. 2016) (explaining that the courts presume "that Congress acts intentionally and purposely in the disparate inclusion or exclusion" of a term) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). And the history of the SIJ provision reflects a congressional intent to expand its scope to encompass a broader class of juveniles. *See* Trafficking Victims Protection Reauthorization Act, Pub. L. 110-457, 122 Stat. 5044, 5079 (the "TVPRA") (removing requirement that SIJ applicant be eligible for "long-term foster care"). Finally, although the Policy Manual (and the district court) invoked § 235(d)(5) of the TVPRA to show that temporary custody orders do not satisfy the SIJ provision, that section applies only to 8 U.S.C. § 1232 — not to the SIJ provision — and it addresses *in loco parentis* relationships rather than custody determinations. *See id.*, 122 Stat. at 5080 (codified as amended at 8 U.S.C. § 1232(d)(5)).

Turning to the specific custody order that Felipe submitted to support his SIJ application, such a valid custody order from the relevant state court was entitled to full credit from the Agency. *See Ojo*, 813 F.3d at 541. It is undisputed in this appeal that the District Court of Mecklenburg County, North Carolina — which entered Perez's custody order — appropriately exercised jurisdiction over Perez, who at that time was a minor

residing in that state.  *See* J.A. 127-28.[6]  The state district court made the necessary findings under North Carolina law and then awarded "emergency temporary custody and control" of Felipe to his brother.  *See id.* at 129; *see also* N.C. Gen. Stat. § 50-13.2 (describing requirements for custody award).  As discussed above, nothing in federal law disqualifies such awards of temporary custody — duly rendered by the appropriate state court — from satisfying the SIJ provision.  And, in awarding custody to Felipe's brother, the North Carolina district court made the only findings that the SIJ provision requires: that Felipe's reunification with his parents was "not viable" because they had "abandoned, neglected, and abused" him; and that it was not in "Perez's best interest to return to [his previous country of nationality,] Guatemala."  *See* J.A. 128-29; *see also* 8 U.S.C. § 1101(a)(27)(J)(i)-(ii).  Thus, Felipe's custody order was valid under North Carolina law and satisfies the plain meaning of the actual requirements of the SIJ provision.

In sum, the term "custody," as used in the SIJ provision, retains its plain meaning, which does not have a temporal limit and accords due deference to the pertinent state court decisions.  *See Ojo*, 813 F.3d at 540-41.  Congress has in no way demonstrated its intention to limit the force of such decisions in the immigration context.  Absent such an intention, the Agency was obliged to recognize the state court custody order submitted by Felipe in support of his SIJ application, and I would — due to this legal error — reverse the Agency's denial of his application.

---

[6] Under North Carolina law, the district courts possess jurisdiction over proceedings concerning child custody.  *See* N.C. Gen. Stat. § 7A-244.

C.

The foregoing analysis demonstrates that federal law does not limit the plain meaning of the term "custody," which can encompass both temporary and permanent relationships. It also shows that, absent a clear indication that Congress sought to limit that meaning, the federal courts and the federal agencies must respect a state court's determination of such matters. Those settled propositions should end our analysis of Felipe's SIJ application.[7]

Given, however, that both the Agency and the panel majority delve into North Carolina law, it is also necessary to briefly clarify their misapprehensions thereof. I simply observe that North Carolina law — like the INA — does not reflect that temporary custody fails to qualify as "custody." Temporary custody is precisely what it purports to be: an award of custody for a limited period of time. *See, e.g.*, *Regan v. Smith*, 509 S.E.2d 452, 454-55 (N.C. Ct. App. 1998) (explaining that temporary custody order has set expiration whereas permanent custody order is intended to last indefinitely). Put succinctly, the meaning of custody under North Carolina law does not exclude temporary orders from the definition of that term. *See, e.g.*, *Peters v. Pennington*, 707

---

[7] In according deference to a state court's determination of custody issues, it is incumbent on the federal courts to simply accept and recognize such orders and the factual findings made therein. Neither our Court nor the Agency is entitled to sit as a reviewing court for the North Carolina district court. Unfortunately, my colleagues stray into such uncertain and untravelled territory by questioning Felipe's intent in seeking his custody order and by criticizing the state court's conclusions regarding its own jurisdiction. *See ante* at 14 n.7. And they do so as they defend principles of federalism. *See id.* Properly applying such principles, however, the federal courts ought not interfere in facially valid domestic relations rulings of the state courts. *See Ojo*, 813 F.3d at 541.

34

S.E.2d 724, 736 (N.C. Ct. App. 2011) (defining custody as "the right and responsibility to make decisions with important and long-term implications for a child's best interest and welfare"); *see also* N.C. Gen. Stat. § 50A-102(3) (defining a "child-custody determination" as a court order "providing for the legal custody, physical custody or visitation with respect to a child" and explaining that "[t]he term includes a permanent, temporary, initial, and modification order").

As to the custody order secured for Felipe from the Mecklenburg County district court, it is true, as the majority observes, that the order was entered under the district court's temporary emergency powers pursuant to N.C. Gen. Stat. § 50A-204. *See* J.A. 127. That provision's grant of jurisdiction, however, is not an empty one — it confers on the state court the power to make a child-custody determination. *See* N.C. Gen. Stat. § 50A-204(b)-(d). And the North Carolina court made such a determination. *See* J.A. 129 (order granting "emergency temporary custody and control" of Felipe to his brother). Again, there is absolutely nothing in North Carolina law that suggests that such a temporary award of custody does not, in fact, confer custody. In these circumstances, the Agency's unwarranted rejection of Perez's custody order for lacking "permanence" is particularly troubling. The Agency's flawed reading of the SIJ provision yields the untenable result that a federal agency has decided that an entire category of state court

custody orders — any order issued in North Carolina pursuant to that state's emergency custody statute — has no effect for purposes of the SIJ provision.[8]

North Carolina distinguishes between temporary and permanent custody orders for other purposes. For example, the temporal scope of a custody order has implications for a court's ability to modify that order. *See Woodring v. Woodring*, 745 S.E.2d 13, 17-18 (N.C. Ct. App. 2013). Moreover, as the majority argues, emergency temporary orders — like the one issued as to Felipe — cannot terminate the parental rights of the child's parents. *See In re N.T.U.*, 760 S.E.2d 49, 52-53 (N.C. Ct. App. 2014). But that rule does not preclude an award of custody to some other person while the parents' rights are finally adjudicated. *See Kanellos v. Kanellos* 795 S.E.2d 225, 229 (N.C. Ct. App. 2002) (explaining that a temporary custody order establishes "a party's right to custody of a child pending the resolution of a claim for permanent custody"). Thus, it is clear that, although there may be limits to the consequences of a temporary custody order, nothing in North Carolina law demonstrates that such an order does not, in fact, confer custody.

Because I would reverse and remand, I respectfully dissent.

---

[8] Of greater concern, the Agency's categorical rejection of temporary custody orders for SIJ applicants logically extends beyond North Carolina to valid child custody orders of other states as well.